UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEVIN KELLEY, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   No. 1:21-cv-01885-JMS-MPB |
| | ) |
| COSTCO WHOLESALE CORPORATION, | ) |
| | ) |
| *Defendant*. | ) |

## **ORDER**

Plaintiff Kevin Kelley seeks recovery for alleged race discrimination and retaliation by his former employer, Defendant Costco Wholesale Corporation ("Costco"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). [Filing No. 1 at 3-5.] Costco has filed a Motion for Summary Judgment, [Filing No. 32], which is ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the nonmoving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir.

2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A.  Mr. Kelley's Employment with Costco**

Costco operates a series of "no-frill, low-cost" warehouses which sell various consumer goods and products.  [Filing No. 33 at 1.]  Each Costco warehouse is overseen by a General Manager, who typically supervises two to three Assistant General Managers.  [Filing No. 33 at 1.] The chain of command then continues to the Staff Level Managers who oversee various operational areas, such as "Front End, Administration, Receiving, and Merchandising."  [Filing No. 33 at 1-2.]  The Staff Level Managers oversee additional department managers and supervisors, including the Front End Supervisors.  [Filing No. 33-1 at 2.]

Mr. Kelley is an African American male.  [Filing No. 47-3 at 1.]  In 2013, he was hired by Costco as a cook in the food court of a Costco warehouse located at 9010 Michigan Road, Indianapolis, IN (the "Fortune Park Costco").  [Filing No. 35-1 at 8; Filing No. 47-1 at 8; Filing No. 47-2 at 1; Filing No. 47-3.]  In 2016, Mr. Kelley was promoted to Front End Supervisor at the Fortune Park Costco.  [Filing No. 35-1 at 16; Filing No. 47-1 at 16; Filing No. 47-3.]  During this time, Tu Rabon was the Fortune Park Costco General Manager, and Tonya Gonzalez was an

Assistant General Manager.   [Filing No. 34 at 1; Filing No. 35-1 at 16.]   Mr. Kelley's direct

supervisor was Antony C. [1]   [Filing No. 35-1 at 28; Filing No. 35-4.]

**B.  Costco's Employment Policies**

Costco maintains its personnel policies and procedures in the Employee Agreement, which

is updated every three years.   [Filing No. 33-1 at 2;Filing No. 35-1 at 2.]   Mr. Kelley received a

copy of the Employee Agreement upon his initial hiring by Costco and received updated copies

when they became available.   [Filing No. 35-1 at 13.]

1.    *Costco's Anti-Harassment and Open Door Policies*

The Employee Agreement contains an Anti-Harassment Policy, which requires all Costco

employees to report "all incidents of harassment, discrimination, retaliation, or other inappropriate

behavior as soon as possible."   [Filing No. 33-1 at 11.]   Specifically, the Employee Agreement

states:

**2.6    REPORTING    HARASSMENT,    DISCRIMINATION,    OR**
**RETALIATION**

If at any time you believe you are being subjected to harassment, discrimination, or
retaliation, if you become aware of such conduct being directed at someone else or
if you believe another person has received more favorable treatment because of
discrimination or sexual favoritism, you are required to report the matter to a
Manager or above as outlined in the Open Door Policy in Section 2.1 or use the
Ethicspoint site, found at www.costco.ethicspoint.com which enables you to submit
a written complaint.

[Filing No. 33-1 at 10.]

The Employee Agreement also contains the Open Door Policy, which provides as follows:

---

[1] Out of respect for the privacy of non-parties, the Court will utilize only the first name and last
initial when referring to the individuals involved in the sexual harassment allegations implicated
in this case.

**2.1 OPEN DOOR POLICY/ RESOLUTION OF DISAGREEMENTS**

When a work-related disagreement or concern occurs, every effort should be made to resolve the issue right away at the workplace level, starting with your Supervisor or Manager. However, Costco's Open Door Policy means that you have the option of contacting any Supervisor or Manager to help you resolve problems. Since Costco fosters an atmosphere of openness and mutual support, you may contact ascending levels of management either verbally or in writing, preferably in the following order:

**1. Supervisor/Manager**
You are encouraged to first speak with your immediate Supervisor/Manager, who will provide a response in a timely manner.

**2. Location Manager**
If you do not feel comfortable approaching your Supervisor/Manager, if your Supervisor/Manager has not resolved the issue, or if you do not agree with your Supervisor/Manager's response, then please inform your Location Manager of the problem, either verbally or in writing. Again, you will receive a prompt response.

**3. Regional/Senior/Executive Vice President**
If you do not agree with the response provided by your Location Manager, or if you are not comfortable approaching your Location Manager, please inform your Regional, Senior, or Executive Vice President of the problem, either verbally or in writing. Again, you will receive a prompt response.

**4. Home Office Human Resources Department**
If you do not agree with the response provided by your Regional, Senior, or Executive Vice President, or if you are not comfortable approaching them, please inform the Home Office Human Resources Department of the problem, either verbally or in writing. Again, you will receive a prompt response.

[Filing No. 33-1 at 6.]

The Employee Agreement further notes that: "[a]ll complaints [of harassment, discrimination, or retaliation] will be kept confidential to the fullest extent possible, and will only be disclosed as necessary to allow [Costco] to investigate and respond to the complaint. No one will be involved in the investigation or response except those with a need to know." [Filing No. 33-1 at 11.]

2.   *Costco's Standards of Conduct and Discipline*

The Employee Agreement also contains Costco's Standards of Conduct and Discipline,

which provide:

**"WHAT ARE THE RULES?"**
**11.0-STANDARDS OF CONDUCT AND DISCIPLINE**
* * * *
**11.3 CAUSES FOR TERMINATION**
Our commitment requires us to operate within the law.  You must adhere to
[Costco's] policies and directives in all aspects of the operation.  The following is
a list of actions that can result in immediate termination of employment.

* * * *
5. Violation of Standard of Ethics for Managers/Supervisors.

[Filing No. 33-1 at 20-22.]

The Standard of Ethics for Managers/Supervisors states that employees in a management

position may not "exploit Costco merchandise, equipment, supplies, or employees for personal

gain."  [Filing No. 33-1 at 28.]   An employee who commits an act that provides grounds for

termination may alternatively be given an unpaid suspension.  [Filing No. 33-1 at 20.]

**C.  Mr. Kelley's Initial Reports of Sexual Harassment**

Outside work, Mr. Kelley maintains a close friendship with fellow Costco employee, Bryna

B.  [Filing No. 35-1 at 26-27.]  In 2019, Bryna B. informed Mr. Kelley that she was being sexually

harassed by Anthony C.   [Filing No. 35-1 at 25-27.]   Prior to learning of the alleged sexual

harassment, Mr. Kelley viewed Anthony C. as a friend.  [Filing No. 35-1 at 37.]

1.   *Mr. Kelley's Letter to Mr. Rabon*

On February 9, 2019, Mr. Kelley wrote a letter to Mr. Rabon to request a transfer.  [Filing

No. 35-3 at 2.]  In his letter, Mr. Kelley described the reasons for his transfer request as follows:

An issue involving a manager and myself has made working directly under this
person unbearable for me.  I was involved with someone outside of work and my
direct manager inside of work got involved in ways that shook me to my core.  I

6

am not seeking punishment to anyone or retaliation, rather to remove myself from the situation. . . . I am seeking a transfer and taking time to mentally accept what has happened and process it all.

[Filing No. 35-3 at 2.]

While Mr. Kelley's letter does not directly mention Anthony C.'s alleged sexual harassment of Bryna B., Mr. Kelley spoke with Mr. Rabon about the harassment but "didn't go into detail because that was not [his] business." [Filing No. 35-1 at 25-26.] Mr. Kelley subsequently had several meetings with Mr. Rabon and other Costco managers regarding his letter and his concerns about sexual harassment by Anthony C. [Filing No. 35-1 at 28.] Mr. Kelley continued to report to Anthony C. during this time. [Filing No. 35-1 at 28.]

## 2. *Mr. Kelley's Voicemail to Dan McMurray*

On March 16, 2019, Mr. Kelley left a voicemail for Dan McMurray regarding the Fortune Park Costco's implementation of Costco's Anti-Harassment Policy.[2] [Filing No. 35-1 at 19-20.] In his voicemail, Mr. Kelley stated that "[m]angement was harassing employees" and specifically noted that Mr. Rabon was part of the harassment. [Filing No. 35-1 at 20.] Mr. Kelley did not directly receive a response to his voicemail from Mr. McMurray. [Filing No. 35-1 at 20.] However, Mr. Kelley's voicemail was forwarded to Mr. Rabon, who confronted Mr. Kelley regarding the contents of the voicemail. [Filing No. 35-1 at 22.] Mr. Rabon appeared upset during the confrontation and expressed frustration regarding the voicemail. [Filing No. 35-1 at 22.]

---

[2] The Court notes that the record is not entirely clear regarding the exact identity of "Dan from HR," but the parties now agree that the recipient of Mr. Kelley's voicemail was Dan McMurray, Regional Vice President for Costco. [*See* Filing No. 1; Filing No. 35-1 at 20-23; Filing No. 46 at 3.]

3.    *Mr. Kelley's First EEOC Complaint and the Ethicspoint Complaint*

On March 29, 2019, Mr. Kelley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining about Costco's implementation of the Anti-Harassment Policy and retaliation by management for reporting harassment (the "First EEOC Complaint").  [Filing No. 35-4 at 2.]  Mr. Kelley received a right-to-sue notice from the EEOC, but he did not proceed with a lawsuit at that time.  [Filing No. 35-1 at 22.]

The same day that Mr. Kelley filed the First EEOC Complaint, an anonymous complaint was submitted to Costco's internal ethics reporting system, Ethicspoint, concerning retaliation at the Fortune Park Costco.[3]  [Filing No. 33-2 at 2-3; Filing No. 35-1 at 29.]  Mr. Kelley does not recall if he submitted the Ethicspoint complaint but does not "remember typing anything to any website."  [Filing No. 35-1 at 28-30.]

**D.  Mr. Kaufman's Investigation**

On April 9, 2019, William Kaufman received a copy of the Ethicspoint complaint from Mr. McMurray.  [Filing No. 33-2 at 2.]  At the time, Mr. Kaufman was the General Manager of a different Costco warehouse (the "South Indianapolis Costco").  [Filing No. 33 at 2.]  Mr. Kaufman was asked to investigate the Ethicspoint complaint as "an outside investigator" because the Ethicspoint complaint "raised allegations about how the General Manager at [the Fortune Park Costco] had addressed certain concerns at his warehouse."  [Filing No. 33 at 2.]  During Mr. Kaufman's investigation, he interviewed 12 Fortune Park Costco employees, including Mr. Kelley and Bryna B.  [Filing No. 33 at 3.]  During each interview, Barbara Hoskins, Merchandise Manager of the South Indianapolis Costco, took notes.  [Filing No. 33 at 3.]

---

[3] The Court notes that much of the body of the Ethicspoint complaint has been redacted.  [Filing No. 33-2 at 3.]

Mr. Kaufman and Ms. Hoskins interviewed Mr. Kelley twice as part of the investigation. [Filing No. 33 at 3.]  Ms. Hoskins' notes from Mr. Kelley's interviews indicate that Mr. Kelley denied making the Ethicspoint complaint.  [Filing No. 33-3 at 2.]  Mr. Kelley does not recall the specific questions that Mr. Kaufman asked during the interviews but does recall Mr. Kaufman saying that he believed that Mr. Kelley was a liar and that he hoped that he would find a reason to fire Mr. Kelley.  [Filing No. 35-1 at 31-36.]

Mr. Kaufman concluded his investigation and determined that the results did not corroborate the Ethicspoint harassment allegations and that Mr. Rabon "investigated and addressed the issues that had been brought to his attention."  [Filing No. 33 at 3.]  Mr. Kaufman did not recommend any disciplinary actions due to his investigation.  [Filing No. 33 at 3.]

On May 26, 2020, Mr. Rabon transferred to a different Costco warehouse, and Mr. Kaufman assumed the position of General Manager at the Fortune Park Costco.  [Filing No. 33 at 4.]  After becoming General Manager of the Fortune Park Costco, Mr. Kelley and Mr. Kaufman had limited interactions and never spoke about the Ethicspoint complaint investigation or Mr. Kelley's First EEOC Complaint.  [Filing No. 35-1 at 38-39.]

**E.  The Removal of Masks from Costco's Warehouse**

When Mr. Kaufman transferred to the Fortune Park Costco, Costco required its employees to wear face masks while at work in response to the COVID-19 pandemic.  [Filing No. 33 at 4.]  During this time, Costco purchased blue and white disposable face masks for employees to wear while at work, which were kept at the entrances to the Fortune Park Costco.  [Filing No. 33 at 4; Filing No. 35-1 at 39.]  The masks came in boxes of five packages, each containing ten masks per package.  [Filing No. 33 at 4.]  Costco stored its supply of masks in a locked, password-secured room.  [Filing No. 33 at 7.]

During this time, Costco employees were told to make sure they had sufficient masks for their entire shifts and to take them home if they needed one for the start of their shift. [Filing No. 35-1 at 41.] Mr. Kelley only wore a Costco-provided mask if he did not have his preferred mask because the masks that Costco provided irritated his skin. [Filing No. 35-1 at 40-41.] Mr. Kelley observed "pretty much everyone" taking masks when exiting the Fortune Park Costco, but he is unsure if other employees were taking full packages of masks. [Filing No. 35-1 at 42-45.]

On July 9, 2020, Mr. Kaufman observed Mr. Kelley leaving the Fortune Park Costco for his break with two packages of masks in his back pocket. [Filing No. 33 at 4.] Mr. Kaufman and Front End Manager, Joe Paccione, then confirmed via surveillance video footage that: (1) Mr. Kelley was wearing a non-Costco supplied black cloth mask; (2) Mr. Kelley exited the Fortune Park Costco for his break with two packages of Costco supplied masks in his back pocket; and (3) Mr. Kelley re-entered the Fortune Park Costco after his break without the Costco supplied masks. [Filing No. 33 at 4; Filing No. 33-4 at 2-6.] Mr. Kelley then left his shift early and went on vacation. [Filing No. 35-1 at 49-51.]

On July 18, 2020, Ms. Gonzalez and Mr. Paccione met with Mr. Kelley about taking the masks upon his return from vacation. [Filing No. 34 at 2; Filing No. 35-1 at 51.] During this meeting, Mr. Kelley admitted to Ms. Gonzalez and Mr. Paccione that he had taken the masks, but denied intending to steal the masks. [Filing No. 34 at 2; Filing No. 35-1 at 52.] Mr. Kelley claimed that he had forgotten that he had the masks but "could not explain where they were or what happened to them." [Filing No. 34 at 2; *see also* Filing No. 35-5.] During this meeting, Mr. Kelley claimed that he had worn a Costco-provided mask during his shift at the Fortune Park Costco but did not tell Ms. Gonzalez or Mr. Paccione that he had taken the masks to wear at work, that he was

told that he could take the masks home, or that other Fortune Park Costco employees had taken masks home.  [Filing No. 34 at 3; Filing No. 35-1 at 48-53.]

Following the meeting, Mr. Kelley signed a statement that reiterated what he conveyed in the meeting and stated, "I understand this [was] a mistake and wrong and I lost focus . . . I again apologize wholeheartedly. I failed to set an example and uphold the rules because of a careless mistake."  [Filing No. 35-5 at 2.]

### F.  Mr. Kelley's Demotion and Resignation

On July 23, 2020, Ms. Gonzalez and Mr. Kaufman met with Mr. Kelley.  [Filing No. 33; Filing No. 35-1 at 54.]  During that meeting, Mr. Kelley was issued a Counseling Notice for violating the Standard of Ethics for Managers/Supervisors and placed on a 3-day unpaid suspension, pending a possible suspension or termination.  [Filing No. 33 at 5-6; Filing No. 34 at 3; Filing No. 34-2 at 2; Filing No. 35-1 at 55; Filing No. 35-6.]  While Mr. Kelley was on suspension, Mr. Kaufman met with Costco's Personnel Department and Mr. McMurray regarding Mr. Kelley's employment status.  [Filing No. 33 at 6.]

While Mr. Kaufman "had support" from the Personnel Department and Mr. McMurray to terminate Mr. Kelley's employment, Mr. Kaufman instead decided to demote Mr. Kelley from a supervisory position instead of terminating him.  [Filing No. 33 at 6.]  Mr. Kelley was given the option of "working in the Front End or as a Morning Stocker."  [Filing No. 33 at 6.]  Mr. Kelley chose to work as a Morning Stocker.  [Filing No. 35-1 at 60.]  After Mr. Kelley's demotion, Costco filled several Front End Supervisor positions, including Mr. Kelley's former position.  [Filing No. 33 at 6.]  Costco hired three Hispanic employees, two White employees, and one Black employee to fill the open Front End Supervisor positions.  [Filing No. 33 at 6.]

On July 28, 2020, Mr. Kelley worked one shift as a Morning Stocker but was then absent from the Fortune Park Costco due to unrelated illnesses and injuries.  [Filing No. 35-1 at 63-65; Filing No. 35-1 at 67-72.]  On December 10, 2020, Mr. Kelley filed a second complaint with the EEOC in which he claimed that "other Caucasian supervisors who took masks home . . . were not suspended," but he "was replaced by Caucasian women who have less seniority and experience" than him.  [Filing No. 47-3 at 1-2.]  Mr. Kelley tendered his resignation from Costco while on medical leave on July 22, 2021.  [Filing No. 35-1 at 68; Filing No. 35-7.]

**G. Raylynn Hill**

Raylynn Hill is also an employee at the Fortune Park Costco.  [Filing No. 47-4 at 1.] Mr. Kelley testified that he believes that Ms. Hill works as a Morning Stocker, but he does not recall her exact department.  [Filing No. 35-1 at 10.]  Ms. Hill testified that: "[d]uring the height of COVID, managers asked employees to wear masks and I was told by managers and supervisors that employees could take any masks that we needed."  [Filing No. 47-4 at 1.]  Ms. Hill testified that she took masks and was never disciplined for doing so.  [Filing No. 47-4 at 2.]

**H. This Lawsuit**

On June 25, 2021, Mr. Kelley filed this lawsuit seeking recovery for race discrimination and retaliation in violation of Title VII and Section 1981.  [Filing No. 1.]  Costco has moved for summary judgment on all of Mr. Kelley's claims.  [Filing No. 32.]

### III.
### PROCEDURAL ISSUES

At the outset, the Court finds it necessary to address several procedural issues related to Mr. Kelley's response to Costco's Motion for Summary Judgment.  First, Mr. Kelley was required to "file a statement of the claims or defenses [he] intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based" by May 2, 2022.  [Filing No. 16 at 6.]

The Court adopted this deadline after it was jointly proposed by the parties.  [Filing No. 15; Filing No. 16.]  Mr. Kelley failed to file a statement of claims by the deadline or by any other date.  The Court has previously warned Mr. Kelley's counsel that the failure to list claims in a statement of claims may result in the abandonment of those claims.  *See Jett v. ISS Facility Servs., Inc.*, 2022 WL 1316528, at *8 (S.D. Ind. May 3, 2022).

Additionally, Mr. Kelley failed to comply with Local Rule 56-1 and this Court's Practices and Procedures regarding summary judgment.  Local Rule 56-1(e) provides that, when briefing a summary judgment motion:

> A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence.  The evidence must be in the record or in an appendix to the brief.  The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence.

S.D. Ind. L. R. 56-1(e).  As the Court's Practices and Procedures make clear: "[c]omplying with [Local Rule 56-1] requires the party to specifically cite to evidence for each fact set forth in the fact **and** argument sections."  [Filing No. 9 at 3 (emphasis original).]  Moreover, the Practices and Procedures note that it is "critically important that exhibits be filed before supporting briefs so that citations in supporting briefs are to the docket numbers of the previously-filed exhibits" and direct the parties to "cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document."  [Filing No. 9 at 3-4.]

The Seventh Circuit has noted "the important function served by local rules that structure the summary judgment process."  *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000).  As the Seventh Circuit has explained:

> The factual statement required by Local Rule 56.1 is not a mere formality.  It follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing

> summary judgment to identify specific facts that establish a genuine issue for trial, and it substantially facilitates the district court's task in deciding whether a trial is indeed necessary.

*Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 924 (7th Cir. 1994). Accordingly, Mr. Kelley's failure to fully comply with Local Rule 56-1 is not "a harmless technicality, but a mistake that [the Seventh Circuit's] precedents (for good reason) have deemed fatal." *Id.* While the Court will not utilize its discretion to rule on Costco's Motion on these bases, the Court reminds Mr. Kelley that "'[j]udges are not like pigs, hunting for truffles buried in briefs.'" *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)). Going forward, Mr. Kelley and his counsel should ensure strict compliance with the Court's Local Rules and its Practices and Procedures in this case and in all other cases.

## IV.
### DISCUSSION

Mr. Kelley raises two categories of claims: (1) that he was demoted and suspended due to his race, in violation of Title VII and Section 1981; and (2) that he was demoted and suspended in retaliation for engaging in a protected activity, in violation of Title VII and Section 1981. [Filing No. 1 at 3-6.] Costco argues that it is entitled to summary judgment on each of Mr. Kelley's claims. [Filing No. 36 at 15-26.] To the extent that it is not entitled to summary judgment, Costco argues that Mr. Kelley is not entitled to damages for any lost wages after he began his leave of absence in July 2020. [Filing No. 36 at 26-27.] The Court will address each argument in turn.

### A. Mr. Kelley's Race Discrimination Claims

With respect to Mr. Kelley's race discrimination claims, Costco argues that it is entitled to summary judgment for three reasons: (1) Mr. Kelley lacks any evidence directly linking his suspension or demotion to his race; (2) Mr. Kelley cannot point to similarly situated individuals outside his protected class who were treated more favorably under similar circumstances; and (3)

Mr. Kelley cannot establish that Costco's reasons for his demotion and suspension were pretextual. [Filing No. 36 at 17-23.]   Specifically, Costco argues that "no decisionmaker or member of management involved in [Mr.] Kelley's suspension and demotion denigrated or otherwise made comments about his race." [Filing No. 36 at 17.]   Costco further argues that Mr. Kelley cannot point to "any non-Black Supervisor who management knew took packages of masks from the [Fortune Park Costco] that were not for their personal use at work, and who then could not account for them, and who was treated more favorably than him." [Filing No. 36 at 17.]   While Mr. Kelley testified that he observed other employees outside of his protected class take masks out of the Fortune Park Costco that were not disciplined, Costco argues that "even if other employees took Costco-purchased masks home with them *so that they had a mask to wear at work*, there is no dispute that [Mr.] *Kelley* did not take masks from the Warehouse on July 9, 2020 for that purpose." [Filing No. 36 at 17 (emphasis in original).]   Finally, Costco argues that Mr. Kelley's alleged violation of the Standard of Ethics for Managers/Supervisors was a legitimate, non-discriminatory reason to suspend and demote Mr. Kelley and "[n]one of the undisputed facts cast doubt on the legitimate bases articulated by Costco." [Filing No. 36 at 19-23.]

Mr. Kelley did not respond to Costco's arguments regarding his race discrimination claims.

Costco replies that Mr. Kelley's failure to respond to its arguments concerning his race discrimination claims should result in a waiver of any argument that these claims survive summary judgment. [Filing No. 48 at 5.]

Mr. Kelley did not respond to Costco's arguments regarding his race discrimination claims nor did he put forth any evidence supporting those claims. [*See* Filing No. 46 at 7-11.] Accordingly, the Court considers Mr. Kelley's Title VII race discrimination claim and Mr. Kelley's Section 1981 race discrimination claim to be waived. *See Goodpaster v. City of Indianapolis*, 736

15

F.3d 1060, 1075 (7th Cir. 2013) (holding that because the plaintiffs "did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument  . . . results in waiver."); *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("unsupported and undeveloped arguments are waived").   Therefore, the Court **GRANTS** Costco's Motion for Summary Judgment as to Mr. Kelley's race discrimination claims under Title VII and Section 1981.

### B.  Mr. Kelley's Retaliation Claims

With respect to Mr. Kelley's retaliation claims, Costco argues that it is entitled to summary judgment because Mr. Kelley cannot establish that a protected activity was the but-for cause of his demotion or suspension.  [Filing No. 36 at 23-26.]  First, Costco argues that there is a "significant" gap in time between Mr. Kelley's first EEOC complaint and his suspension.  [Filing No. 36 at 24.] During that gap, Costco argues, Mr. Kelley violated the Standard of Ethics for Managers/Supervisors, which served as an "intervening event" that broke any chain of causation. [Filing No. 36 at 24.]  Additionally, Costco argues that there is no reasonable basis for inferring that Mr. Kaufman's investigation into the anonymous Ethicspoint complaint was connected to Mr. Kelley's suspension and demotion because: (1) Mr. Kelley denied submitting the Ethicspoint complaint; (2) neither the Ethicspoint complaint nor Mr. Kelley's first EEOC complaint implicated Mr. Kaufman in any way; and (3) the investigation that led to Mr. Kelley's suspension and demotion was completed by Ms. Gonzalez and Mr. Paccione who had no knowledge of Mr. Kaufman's prior investigation.  [Filing No. 36 at 24-26.]  Finally, Costco argues that Mr. Kaufman could have terminated Mr. Kelley for removing masks from the Fortune Park Costco

for personal use, but instead, Mr. Kaufman "extended [Mr.] Kelley the benefit of the doubt – and continued [his] employment – given [Mr.] Kelley's professed mistake." [Filing No. 36 at 25-26.]

In response, Mr. Kelley argues that he has established a causal link between his first EEOC complaint and his adverse employment actions because Costco's stated reasons for suspending and demoting him were pretextual for three reasons. [Filing No. 46 at 8-9.] First, Mr. Kelley argues that the Seventh Circuit has "never issued a bright line rule to prove a causal link between the protected activity and the adverse action" but allowed "retaliation charges to proceed in the face of long intervals when additional circumstances demonstrate that an employer's acts might not be legitimate." [Filing No. 46 at 9-10.] Here, Mr. Kelley argues, that Mr. Kaufman "knew that Mr. Kelley filed [the first EEOC] complaint and informed Mr. Kelley that he would look for a reason to terminate Mr. Kelley when he got the chance and that was exactly what [Mr.] Kaufman did." [Filing No. 46 at 10.] Second, Mr. Kelley argues that Costco's reason for disciplining him was not the "real reason" because Mr. Kaufman "informed Mr. Kelley that he would terminate him as soon as he got the chance and then demoted Mr. Kelley for something that everyone was allowed to do." [Filing No. 46 at 9.] Finally, Mr. Kelley argues that Costco's reason for disciplining him was insufficient to warrant his suspension and demotion because other employees took masks and "there was even a sign informing employees to take masks if needed," but only Mr. Kelley was disciplined for doing so. [Filing No. 46 at 9.]

With respect to Mr. Kelley's Section 1981 retaliation claim, Costco replies that Mr. Kelley points to the First EEOC Complaint as his statutorily protected activity. [Filing No. 48 at 2.] However, Costco argues, the First EEOC Complaint only concerns allegations related to sexual harassment, and Mr. Kelley has cited no other evidence that he complained of race discrimination prior to his discipline in July 2020. [Filing No. 48 at 2.] Because Section 1981 "only encompasses

claims based on *racially-motivated* retaliation or discrimination," Costco argues that Mr. Kelley's Section 1981 claim fails.  [Filing No. 48 at 6 (emphasis original).]  Additionally, Costco reiterates its arguments on reply that: (1) the "16-month gulf" between when Mr. Kelley filed his first EEOC Complaint and the alleged retaliation is "vast, without any events to suggest a cause-and-effect," [Filing No. 48 at 11-13]; (2) Mr. Kelley has "no evidence" that links the First EEOC Complaint to Mr. Kaufman's investigation or the ultimate decisions to demote and suspend him, [Filing No. 48 at 8-9]; and (3) Mr. Kelley's conduct was sufficient to merit a 3-day suspension and demotion, [Filing No. 48 at 10-11].  Finally, Costco argues that employees may have been "told to take masks *if they needed them*, to ensure they had masks to wear at work," but there is "no dispute that [Mr.] Kelley did *not* remove masks from the warehouse because he 'needed' to wear them at work." [Filing No. 48 at 10 (emphasis original).]

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Section 1981 ensures that "all persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  The term "make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including employment contracts. 42 U.S.C. § 1981(b); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008).  The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir.

18

2013) ("The substantive standards and methods that apply to Title VII also apply to 42 U.S.C. § 1981.").  To survive summary judgment on his retaliation claims under Section 1981 and Title VII, Mr. Kelley must present evidence that, when construed in his favor and giving him the benefit of reasonable inferences, would allow a reasonable jury to find that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) his protected activity and the adverse actions were causally connected. *Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (courts apply the same standards to retaliation claims brought under Title VII and Section 1981).

The Court will first address Costco's arguments that Mr. Kelley did not engage in an activity protected by Section 1981 before turning to Costco's arguments regarding causation.

### 1. Protected Activity

The parties do not dispute that Mr. Kelley engaged in a protected activity for purposes of his Title VII retaliation claim, but Costco argues that Mr. Kelley's filing of the First EEOC Complaint is not an activity protected by Section 1981. [4]  [*See* Filing No. 36; Filing No. 46; Filing No. 48.]  The Seventh Circuit has explained that "'[r]egardless of which method the plaintiff employs to show retaliation, he must first demonstrate that he engaged in activity that is protected by the statute.  Specifically, he must show that he took some step in opposition to a form of discrimination that the statute prohibits.'" *Arce v. Chicago Transit Auth.*, 738 F. App'x 355, 359 (7th Cir. 2018) (quoting O'Leary, 657 F.3d at 631)).  While Section 1981 provides a "broad-based prohibition (and federal remedy) against racial discrimination in the making and enforcing of

---

[4] Costco does dispute that Mr. Kelley's internal complaint to Mr. McMurray constitutes a protected activity.  [Filing No. 36 at 23.]  However, Mr. Kelley does not assert that his voicemail to Mr. McMurray was a protected activity and, therefore, the Court need not resolve this issue.  [Filing No. 46 at 8.]

contracts," *Humphries,* 474 F.3d at 393, Section 1981 does not extend to other forms of discrimination, *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 772 F.3d 443, 447 (7th Cir. 2014); *see also Anooya v. Hilton Hotels Corp.,* 733 F.2d 48, 49–50 (7th Cir. 1984) ("The legislative history of the statute clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality.  Thus, Section 1981 does not protect against discrimination based on sex or religion or age.").

Mr. Kelley's First EEOC Complaint concerns Costco's "implementation of the harassment policy as well as specific incidents of sexual harassment complaints involving [Anthony C.] (Front Manager)."  [Filing No. 35-4 at 2.]  Mr. Kelley has not alleged that he complained of race discrimination, either to the EEOC or internally to Costco management, prior to his suspension and demotion.  [Filing No. 35-1 at 22-24; Filing No. 35-4.]  This is insufficient to support a claim for retaliation under Section 1981.  Therefore, the Court **GRANTS** Costco's Motion for Summary Judgment with respect to Mr. Kelley's retaliation claim under Section 1981.

### 2.    *Causation*

To succeed on his Title VII retaliation claim, Mr. Kelley must show that his protected activity was "the but-for cause" of the adverse employment action meaning that "the adverse action would not have happened without the [protected activity.]"  *Mollett v. City of Greenfield,* 926 F.3d 894, 897 (7th Cir. 2019).  Causation may be shown through direct evidence, which "would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')."  *O'Leary,* 657 F.3d at 630–31.  Causation can also be established by "circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently.'  This list is not exclusive; the plaintiff can point to any 'other evidence from

which an inference of discriminatory intent might be drawn.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)).

a.    <u>Suspicious Timing</u>

Turning to the parties' arguments regarding suspicious timing, Mr. Kelley is correct that the Seventh Circuit has not adopted a "bright line rule to prove a causal link between the protected activity and the adverse action." [Filing No. 46 at 9 (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017).)]  However, this is an incomplete characterization of the Seventh Circuit's guidance on suspicious timing.  "Temporal proximity between protected activity and an adverse employment action can support an inference of causation between the two." *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022).  However, suspicious timing alone rarely establishes causation. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (citing *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015)).

"For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, [courts] typically allow no more than a few days to elapse between the protected activity and the adverse action." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578–79 (7th Cir. 2021).  In contrast, an inference of retaliation "can be weakened by 'a lengthy time period between the protected activity and the alleged retaliation.'" *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014)); *Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.").

That being said, the mere existence of a lengthy gap in proximity does not undermine a "causal connection that is other-wise supported by sufficient circumstantial evidence." *Baines,* 863 F.3d at 665; *see also Lalvani,* 269 F.3d at 791 ("We acknowledge that temporal proximity is only evidence of causation, not a separate element of the *prima facie* case, and thus there will be cases in which a plaintiff can demonstrate causation despite a substantial time lag.").  In instances where there is a prolonged gap between a protected activity and the adverse action, the plaintiff must introduce additional evidence to establish a causal connection, such as "evidence of prolonged antagonism against the plaintiff, evidence that, despite a long gap, the alleged retaliation was the first opportunity for retaliation, or something similar." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) (finding that evidence of an "ongoing campaign of retaliation" supported inference of retaliatory motivate despite lengthy gap in timing); *Malin v. Hospira, Inc.*, 762 F.3d 552, 559-60 (7th Cir. 2014) (evidence that defendant "had a long memory," repeatedly retaliated against plaintiff by denying her promotions, and then demoted her when given first opportunity was sufficient to survive summary judgment).  In instances where an employer acted upon its first opportunity to retaliate, the delay in retaliatory conduct "cannot be used to suggest a break in the causal chain." *Alamo*, 864 F.3d at 556.  Here, nearly 16 months passed between Mr. Kelley's First EEOC Complaint and the alleged retaliation.  [*See* Filing No. 35-4; Filing No. 35-6.] This period alone is insufficient to support an inference of causation.  *See Khungar,* 985 F.3d at 578–79; *see also Sklyarsky,* 777 F.3d at 898 (7th Cir. 2015) (holding six months between complaint and adverse action was insufficient to support retaliation claim without additional evidence); *see also Mintz,* 788 F.3d at 681 (holding nine months between complaint and adverse action "suggests no connection").

Mr. Kelley seemingly suggests that Mr. Kaufman demoted him at his first opportunity to do so. [*See* Filing No. 46 at 10 .]  However, Mr. Kelley has not established that his demotion was Mr. Kaufman's first opportunity to retaliate against him.  The record establishes that Mr. Kaufman had the opportunity to make disciplinary recommendations concerning Mr. Kelley during the Ethicspoint complaint investigation – which he did not take.  [Filing No. 33 at 3.]  Moreover, Mr. Kaufman could have terminated Mr. Kelley for violating the Standard of Ethics for Managers/Supervisors and had terminated other Costco employees for doing so.  [Filing No. 33 at 6-7; Filing No. 35-1 at 57.]  However, Mr. Kaufman did not terminate Mr. Kelley but, instead, offered him a demotion to a non-managerial position of his selection.  [Filing No. 33 at 6-7.]  This is not evidence from which one could reasonably infer that Mr. Kelley "waited in the weeds" for the right time to retaliate against Mr. Kelley for filing his EEOC charge.  *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996).  Accordingly, Mr. Kelley must establish a causal connection in another manner.

### b.  Pretextual Reason for Discipline

Additionally, Mr. Kelley argues that Mr. Kaufman's stated reason was not "the real reason" for his discipline.  [Filing No. 46 at 9.]  Specifically, Mr. Kelley argues that "[Mr.] Kaufman knew that Mr. Kelley filed [the First EEOC Complaint] and informed Mr. Kelley that he would look for a reason to terminate Mr. Kelley. . . and that was exactly what [Mr.] Kaufman did . . . for doing something that [Mr. Kelley] was told by management he could do and that others had done (take masks)."  [Filing No. 46 at 9-10.]  However, there is an insurmountable evidentiary hole at the center of this argument.

Knowledge of a protected activity is necessary to show causation for a retaliation claim.  *Lesiv*, 39 F.4th at 920; *see also Carlson*, 758 F.3d at 829.  "It is not sufficient that a decision-maker

could have or even should have known about the employee's complaint." *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021).   Mr. Kelley failed to introduce any admissible evidence that Mr. Kaufman was aware that he had filed the First EEOC Complaint.   To the contrary, Mr. Kelley testified that he and Mr. Kaufman never discussed his First EEOC complaint, and Mr. Kaufman never brought it up.   [Filing No. 35-1 at 30-31.]   Moreover, the record suggests that the scope of Mr. Kaufman's investigation was limited to the anonymous Ethicspoint complaint – a complaint Mr. Kelley denied submitting during Mr. Kaufman's investigation and now does not recall if he did, in fact, submit.   [Filing No. 33; Filing No. 33-3 at 1; Filing No. 35-1 at 29-30.] Simply put, if an employer did not know that its employee engaged in a statutorily protected activity, the employer cannot be trying to penalize the employee for engaging in that activity.   *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668–69 (7th Cir. 2006).   Here, Mr. Kelley has not pointed to admissible evidence in the record from which a reasonable jury could conclude that Mr. Kaufman was aware of his First EEOC Complaint.

Mr. Kelley hypothesizes that the real reason for Mr. Kaufman's Ethicspoint investigation was actually his First EEOC Complaint.   [Filing No. 35-1 at 31.]   However, in the absence of other evidence supporting this inference, this is too speculative to defeat summary judgment.   "While [Mr. Kelley] is entitled, as the nonmoving party, to all reasonable inferences in [his] favor, 'inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.'"   *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)).   While it is possible that Mr. Kaufman was aware of Mr. Kelley's First EEOC Complaint, Mr. Kelley simply has presented no evidence showing this to be the case, which "dooms" his claim. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009).

c.   Treatment of Similarly Situated Employees

Finally, Mr. Kelley claims that he has established causation because he engaged in conduct that "others had done."  However, this assertion also lacks evidentiary support.  Evidence that "similarly situated employees" who did not engage in protected conduct were "treated differently may furnish circumstantial evidence of retaliation or other unlawful motive."  *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018).   But "[t]o invoke this type of circumstantial evidence of unlawful motive . . . the plaintiff and the comparator normally must have . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* (citing *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). (cleaned up).

While ordinarily such comparisons present factual issues for the jury to decide, the Court agrees with Costco that Mr. Kelley relies upon conduct that is too different from Mr. Kelley's conduct to defeat summary judgment.  While Mr. Kelley points to the testimony of Ms. Hill as an example of another Costco employee who took masks but was not disciplined, the Court notes that Ms. Hill did not testify that she took masks for personal use but instead testified that "[d]uring the height of COVID, managers asked employees to wear masks and I was told by managers and supervisors that employees could take any masks that we needed." [5]  [Filing No. 47-4 at 1.]

---

[5] Although Costco did not raise this argument, the Court also notes that Mr. Kelley was demoted for violating the Standard of Ethics for Managers/Supervisors, which applies to employees in a supervisor position.  [*See* Filing No. 35-2 at 2; *see also* Filing No. 35-6 at 2 ("As a supervisor, it is imperative that [Mr. Kelley] understands that being in a leadership role requires him to remain professional/ethical at all times.")]  There is no evidence in the record suggesting that Ms. Hill was a supervisor at the Fortune Park Costco and thus subject to the Standards of Ethics for Managers/Supervisors.  Instead, Mr. Kelley's testimony suggests that Ms. Hill was a Morning Stocker – the position that Mr. Kelley was demoted to after losing his supervisor position.  [*See* Filing No. 35-1 at 10.]  If Ms. Hill was not subject to the same employment policies as Mr. Kelley, she would not be similarly situated enough to Mr. Kelley to provide a meaningful comparison.  *See Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir. 2012).

Additionally, Mr. Kelley concedes that Costco employees were told that they could take masks home to "ensure they had masks *when arriving at work*" and that other Costco employees took masks home "so that they had them *when they walked into the warehouse*."  [Filing No. 46 at 5 (emphasis added); *see also* Filing No. 35-1 at 41-42; Filing No. 36 at 9.]

Mr. Kelley does not allege that he took masks so that he could wear them at work, that he told Costco that he took masks so that he could wear them at work, or that he brought the masks back to the Fortune Park Costco.  [Filing No. 33 at 6; Filing No. 34-1 at 3; Filing No. 34-2 at 3; Filing No. 35-1 at 53.]  Instead, Mr. Kelley acknowledged that he "honestly forgot" that he had the masks and "lost focus on making sure to leave the rest at" the Fortune Park Costco before going on vacation.  [Filing No. 35-5 at 2.]  Moreover, Mr. Kelley "apologize[d] wholeheartedly" for "fail[ing] to set an example and uphold the rules."  [Filing No. 35-5 at 2.]  Perhaps other Costco supervisors took masks from the Fortune Park Costco for personal use and were not disciplined for doing so, but Mr. Kelley has not pointed to admissible evidence in the record to establish that fact.

Employees are similarly situated "only if they committed comparable policy violations." *Matthews v. Wal-Mart Stores, Inc.,* 417 F. App'x 552, 554 (7th Cir. 2011).  Here, Mr. Kelley does not point to comparable policy violations and instead points to conduct by other Costco employees which were not policy violations at all but conduct that Costco expressly permitted.  Put another way, Mr. Kelley did something that he admits was a violation of Costco's rules whereas the other Costco employees in the record did something they were allowed and encouraged to do.  Even viewing the facts most favorably to Mr. Kelley, the circumstances of his conduct are distinguishable from the other Costco employees' conduct, and there is no evidence in the record

from which a reasonable jury could conclude that Costco acted with a retaliatory motive. *See Donley,* 906 F.3d at 639; *see also Matthews,* 417 F. App'x at 554.

For the reasons discussed above, Mr. Kelley has failed to establish a causal connection between a protected activity and the adverse employment actions that he suffered, and thus, his retaliation claim under Title VII fails. Therefore, the Court **GRANTS** Costco's Motion for Summary Judgment with respect to Mr. Kelley's retaliation claim under Title VII.

### C. Mr. Kelley's Claims for Damages for Lost Wages

Because the Court has granted summary judgment on each of Mr. Kelley's claims, it need not address the parties' arguments regarding the availability of damages for lost wages.

### V.
### CONCLUSION

As the Seventh Circuit has made clear, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Diadenko v. Folino,* 741 F.3d 751, 757-58 (7th Cir. 2013) (quoting *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008)). Mr. Kelley has failed to meet his burden at summary judgment, and for the reasons discussed above, the Court **GRANTS** Costco's Motion for Summary Judgment, [32], on all of Mr. Kelley's claims. Final judgment shall issue accordingly.

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**